THEODORE W. VAN ZELST AND LOUANN H. VAN ZELST, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Van Zelst v. Commissioner
Docket Nos. 22030-90, 22031-90, 22032-90, 22033-90, 22034-90.
United States Tax Court
T.C. Memo 1995-396; 1995 Tax Ct. Memo LEXIS 396; 70 T.C.M. (CCH) 435; August 16, 1995, Filed *396 Decision will be entered under Rule 155. Stephen Joseph Morrow and Jeffrey E. Schiller, for petitioners in docket Nos. 22030-90, 22031-90, 22033-90, and 22034-90. Stephen Joseph Morrow and Ralph E. Brown, for petitioners in docket No. 22032-90. Scott M. Estill and Patricia Pierce Davis, for respondent. JACOBS, Judge JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Pursuant to notices of deficiency dated July 19, 1990, respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Theodore W. and Louann H. Van Zelst, Docket No. 22030-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 7,643 $ 382.15
[2] $ 2,293
[3] *397 1986
12,764
638.20
[2]
3,829
[3]
1987
21,647
1,082.35
[2]
6,464
[3]
Jean Van Zelst, Docket No. 22031-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 1,621 $ 81.05
[2] $ 468.30
[3]
1986
5,305
265.25
[2]
1,592.50
[3]
1987
7,327
366.35
[2]
2,198.10
[3]
Ralph E. and Suzanne Brown, Docket No. 22032-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 24,810 $ 1,240.50
[2]
$ 7,443.00
[3]
1986
34,231
1,711.55
[2]
10,269.30
[3]
1987
1,577
78.85
[2]
473.10
[3]
Bradley and Anne L. Orvieto, Docket No. 22033-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 1,225 $ 61.25
[2] $ 367.50
[3]
1986
8,216
410.80
[2]
2,464.80
[3]
1987
19,151
957.55
[2]
5,745.30
[3]
Theodore D. Van Zelst, Docket No. 22034-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 1,754 $ 87.70
[2] $ 526.20
[3]
1986
5,616
280.80
[2]
1,684.80
[3]
1987
23,774
1,188.70
[2]
7,132.20
[3]
Pursuant to amended answers filed on August 11, 1992, [2] respondent increased petitioners' deficiencies and additions to tax to the following *398 amounts: Theodore W. and Louann H. Van Zelst, Docket No. 22030-90:
Additions to Tax and Additional Interest
Sec.
Sec
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 16,444 $ 822
[2] $ 4,933
[3]
1986
35,016
1,751
[2]
10,505
[3]
1987
32,801
1,640
[2]
9,840
[3]
Jean Van Zelst, Docket No. 22031-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 4,482 $ 224
[2] $ 1,345
[3]
1986
6,464
323
[2]
1,939
[3]
1987
7,327
366
[2]
2,198
[3]
Ralph E. and Suzanne Brown, Docket No. 22032-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 31,272 $ 1,564
[2] $ 9,382
[3]
1986
34,231
1,712
[2]
10,269
[3]
1987
1,577
79
[2]
473
[3]
Bradley and Anne L. Orvieto, Docket No. 22033-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 3,527 $ 176
[2] $ 1,058
[3]
1986
12,813
641
[2]
3,844
[3]
1987
19,151
958
[2]
5,745
[3]
Theodore D. Van Zelst, Docket No. 22034-90:
Additions to Tax and Additional Interest
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
[1] 6653(a)(1) 6653(a)(2)
6659
6621(c)
1985 $ 4,841 $ 242
[2] $ 1,452
[3]
1986
6,975
349
[2]
2,093
[3]
1987
23,774
1,189
[2]
7,132
[3]
*399 This case concerns petitioners' 1985 donation to the National Park Service of 93 patented and 154 unpatented acres of undeveloped land (the donated property), located in the Wrangell-St. Elias National Park and Preserve (the Park). The issues for decision are: (1) The fair market value of the donated land at the time of donation; (2) whether all petitioners, other than Ralph E. and Suzanne Brown, failed to properly elect the 50-percent limitation regarding their respective contribution bases for 1985, 1986, and 1987; (3) whether petitioners are liable for additions to tax for negligence or intentional disregard of rules or regulations; (4) whether petitioners are liable for additions to tax for valuation overstatements; and (5) whether petitioners are liable for additional interest. All section references are to the Internal Revenue Code in effect for the years under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts and the attached exhibits are incorporated herein by this reference. Background
All petitioners are members of *400 the Van Zelst family, with the exception of Ralph and Suzanne Brown. Theodore W. (T.W.) and Louann H. Van Zelst are the parents of Jean Van Zelst, Anne Orvieto, and Theodore D. Van Zelst. Bradley Orvieto is T.W. and Louann Van Zelst's son-in-law. Petitioners T.W. and Louann H. Van Zelst, husband and wife, resided in Glenview, Illinois, at the time they filed their petition herein. T.W. Van Zelst is a civil engineer specializing in soils and rock, and an investor in large development projects. Petitioner Jean Van Zelst resided in Wilmette, Illinois, at the time she filed her petition. She is a science consultant for elementary schools. Petitioners Ralph and Suzanne Brown, husband and wife, resided in Chicago, Illinois, at the time they filed their petition. Mr. Brown is an attorney. Petitioners Bradley and Anne Orvieto, husband and wife, resided in Plantation, Florida, at the time they filed their petition. Mr. Orvieto is a financial planner and president of 26th Street Venture, a Plantation, Florida, limerock mining firm. Petitioner Theodore D. Van Zelst resided in Glenview, Illinois, at the time he filed his petition. He is president of Van Zelst, Inc., a landscape design, construction, *401 and management company. 1. The Donated Property[3]
The donated property is located in the Chitistone River Valley area of Alaska. The Park was created by the Alaska National Interest Lands Conservation Act on December 2, 1980. The Park covers 13.2 million acres, including vast areas of extremely rugged, high-mountain terrain. [4]
*402 The donated property consists of 93 patented [5] acres (Nelson Mine property or patented acres) and 154 unpatented [6] acres (Peavine property or unpatented acres). [7] The donated property is located on the north side of a mountain, approximately 18 miles east of McCarthy, Alaska, and approximately 230 air miles northeast of Anchorage. It is located on the southwest side of Glacier Creek, above the creek bed, and .75 mile upstream from the confluence of the Chitistone River and Glacier Creek. Several structures exist on the donated property, but they are in a state of disrepair. The property is remote and access is difficult. *403 a. The Nelson Mine Property
Glacier Creek separates the Nelson Mine property (which contains six mining claims) from an unpaved, gravel airstrip. [8] The presence of Glacier Creek, whose current in the spring and summer is dangerous and generally impossible to cross by foot, makes it difficult to reach the Nelson Mine property from the airstrip. [9] Thus, access to the patented acres is limited to helicopters or small-wheel planes. In addition, it is impossible to drive a vehicle on the property's trails due to heavy vegetation growth. The majority of the terrain at the Nelson Mine property is quite steep. The patented acres start at 2,700 feet above sea level and rise to a 3,700-foot elevation over a distance of 2,360 feet. The land has an 86-percent slope facing *404 east/northeast. Because of this slope, it is dangerous for helicopters to land on the patented acres. b. The Peavine Property
The unpatented acres are located approximately 5 miles from the patented acres, near the Chitistone Trailhead. An unpaved gravel airstrip also exists near the Peavine property. Rock slides are common in the area. The main mineral content of the unpatented acres is copper. 2. Ownership History of the Donated Property
On or about September 26, 1969, Geneva Pacific Corporation (Geneva Pacific) purchased the Nelson Mine property. Geneva Pacific was a research company located in Evanston, Illinois, that field tested seismic and electrical resistivity instruments and conducted mineral exploration. T.W. Van Zelst was founder and president of Geneva Pacific. [10] His first visit to the patented acres was on Geneva Pacific's behalf. *405 Ownership of Geneva Pacific changed hands several times during the 1970's. In the mid-1970's, Cenco, Inc. (Cenco), [11] held a 50-percent interest in Geneva Pacific. In 1981, Cooper Industries (Cooper) [12] acquired Geneva Pacific. As part of this acquisition, Cooper acquired the Nelson Mine property as well as the unpatented acres. [13] T.W. Van Zelst operated and managed the donated property on Cooper's behalf. Geneva Pacific was dissolved in 1983. *406 Both Geneva Pacific and Cooper attempted to mine copper and other minerals at the donated property but found it economically unfeasible to do so. Geneva Pacific filed patent applications with respect to the unpatented acres in February 1982, but withdrew the applications in February 1984. 3. Sale of Donated Property to T.W. Van Zelst
Cooper attempted to sell the donated property beginning in 1982, first for $ 500,000, and then for $ 250,000, but received no offers. Cooper became eager to sell the donated property because of its desire to dispose of its Geneva Pacific holdings. Ultimately, on April 30, 1983, Cooper sold the donated property to T.W. Van Zelst [14] *407 in connection with the termination of his employment with Geneva Pacific and Cooper. The purchase price for the property consisted of two elements: (1) $ 30,174; and (2) T.W. Van Zelst's waiver of any royalty rights he had under his Geneva Pacific employment contract. [15] Concurrent with his real property purchase, T.W. Van Zelst purchased from Cooper an International Harvester Scout II vehicle for $ 3,000, and various other personal property for $ 6,826. T.W. Van Zelst's purchase of the donated property was subject to an April 23, 1979, condition executed by Geneva Pacific and Cenco, whereby Cenco had a right to buy back a percentage interest in the property. [16] The Cenco option was to expire on June 1, 1985. The option was executed after Cenco sold its interest in Geneva Pacific, and was intended to avoid possible embarrassment to Cenco if copper were discovered after the transaction. During the period that T.W. Van Zelst owned the donated property, he neither improved nor attempted to mine the property. [17] Further, he neither filed patent applications nor was awarded a patent with respect to any of the unpatented acres. *408 4. Donation to the National Park Service
While retaining a 73.5-percent interest for himself and his wife, T.W. Van Zelst gave the remainder of the patented and unpatented acres to the other petitioners involved herein. On October 10, 1983, T.W. Van Zelst gave undivided percentage interests to the other petitioners as follows: Jean Van Zelst (6 percent); Anne Orvieto (6 percent); Bradley Orvieto (3.5 percent); Theodore D. Van Zelst (6 percent); and Mr. Brown (5 percent). On November 1, 1984, T.W. Van Zelst and Mr. Brown discussed the possible donation of the subject property to the National Park Service. [18] On July 30, 1985, petitioners donated the Nelson Mine property and the unpatented acres to the National Park Service. At the time of donation, the *409 donated property was subject to an injunction. The injunction was entered on July 22, 1985, by the U.S. District Court for the District of Alaska. The injunction, which was motivated by environmental concerns, precluded mining activity in Alaskan National Parks without court approval. [19]
5. Petitioners' Federal Income Tax Returns
On petitioners' 1985 Federal income tax returns, they calculated the amount of their charitable contribution deductions based on their respective percentage-ownership interests in the donated property. They attached Forms 8283, Noncash Charitable Contributions Appraisal Summary, to their returns, disclosing the donation of the property to the National Park Service. Attached to the Forms 8283 was a certification of appraiser C.C. Hawley, of the Hawley Resource Group, Inc., valuing the donated property at $ 2,750,000. *410 Petitioners each used a 50-percent ceiling on the returns in calculating their charitable contributions at issue. Petitioners carried over the unused portions of their charitable contribution deductions to their 1986 and 1987 returns. ULTIMATE FINDING OF FACT The fair market value of the donated patented and unpatented acres on July 30, 1985, the date of donation, was $ 38,000. OPINION Issue 1. Fair Market Value of the Donated Property
The first issue for decision is the fair market value of the donated property for purposes of determining the proper amount of petitioners' charitable contribution deductions. The notices of deficiency determined the fair market value to be $ 286,500. Petitioners have the burden of proving that the fair market value of the donated property exceeds the value determined by respondent in the notices of deficiency. Rule 142(a); Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987); McGuire v. Commissioner, 44 T.C. 801, 806 (1965). By amendments to answers, however, respondent redetermined the fair market value of the donated property to be $ 28,000, thereby increasing the originally *411 determined deficiencies and additions to tax. Respondent bears the burden of proving the increases in the deficiencies and additions to tax asserted in the amended answers. Rule 142(a); Estate of Bowers v. Commissioner, 94 T.C. 582, 595 (1990). Section 170 allows an individual to deduct charitable contributions, subject to certain percentage limitations, with a carryover of any excess contributions. See sec. 170(b), (d). If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution. Sec. 1.170A-1(c), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.
The fair market value of donated property as of a given date is a question of fact to be determined from the entire record. Symington v. Commissioner, 87 T.C. 892, 896 (1986); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), *412 affd. 731 F.2d 1417 (9th Cir. 1984). The fair market value of property reflects the highest and best use of the property [20] on the date of valuation. Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). Determination of fair market value is not dependent upon whether the property is actually being put to its highest and best use. Rather, it is the realistic, objective potential use to which the property can be put. Id.; see also Mitchell v. United States, 267 U.S. 341, 344-345 (1925); United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir. 1958); Hilborn v. Commissioner, 85 T.C. 677, 689-690 (1985). Respondent maintains that the highest and best use of the property is as a remote recreational cabin site. Petitioners maintain that the highest and best use of the property is as a full-scale developed recreational resort. Respondent's experts opined that the fair market value of the donated property on the date of donation was $ 28,000. In contrast, petitioners' experts opined that the fair market value on the date of donation *413 was $ 2,750,000. As the trier of fact, we must weigh the evidence presented by the experts in light of the demonstrated qualifications of the experts in addition to all other credible evidence. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). However, we are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We may accept or reject expert testimony as we find appropriate in our best judgment. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); *414 Seagate Tech., Inc. & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994). I. The Parties' Experts
A. Valuations of Petitioners' Experts
1. The Hawley Report
Close to the time of donation, petitioners requested an appraisal of the donated property by C.C. Hawley, Toni K. Hinderman, and William E. Shoemaker of the Hawley Resource Group, Inc.[21] The June 30, 1985, appraisal report (Hawley Report), prepared mainly for investment purposes, concluded that the donated property's "current value" was $ 2,750,000. [22] This figure comprises $ 2,100,000 for the fee simple interest of the patented acres and $ 650,000 for the donated property's mineral interests. The Hawley Report based its valuation on (1) the hypothetical use of the patented acres as a seasonal recreational resort, and (2) the potential for mineral development on the donated property. *415 The Hawley Report valuation of the patented acres assumes the highest and best use of the property to be a commercial recreational lodge. In this regard, the following assumptions were made: (1) The resort would be open only in the summer season (June 1 through September 30); (2) a variety of possible activities would be offered to guests, including wildlife and nature photography, hiking, horseback riding, river rafting, helicopter tours, and recreational mining; (3) the facility would provide its guests with transportation to and from the resort; and (4) while access to the patented acres was limited, roads, trails, *416 and air fields located on or near the property would be used in connection with the recreational development. Mr. Shoemaker prepared that portion of the Hawley Report addressing the proposed resort development on the patented acres. [23] *417 Believing that no other comparable land sales existed, he utilized the income stream or discounted cash flow approach to determine the "current value" of the patented acres. Pursuant to this approach, Mr. Shoemaker determined the "current value" of the patented acres to be $ 2,100,000. [24] He arrived at the $ 2,100,000 amount by projecting costs and revenues of the hypothetical operation over time, and discounting the value of earnings for each year after the first year of operation to account for the rate of return that an investor would expect to achieve on a present value basis. [25] He concluded that an individual who invested $ 2,100,000 to purchase the patented acres would achieve a 17-percent rate of return if the development were resold in the 11th year after construction. This return, he asserted, would induce an investor to purchase the patented acres for $ 2,100,000. The Hawley Report considered the anticipated copper mining project to be of a small scale but that the properties would have the potential to be mined profitably. [26] The Report stated that "the proposed development of any mine has to be viewed as one of high risk." The Report concluded that the "current value" of the mineral interests on the date of donation was $ 650,000. At trial, Mr. Hawley admitted that this amount was but an estimate. *418 The Hawley Report contains several plans for starting and carrying out the proposed mining project: (1) Operating a small mine producing 100 tons of salable minerals (largely copper) per day; (2) operating the mine for only 5 months (spring and summer months) per year to keep down higher mining costs that would occur in winter; and (3) the use of cat-trains and trucks, rather than helicopters, to transport the recovered minerals. The Hawley Report concluded that 90,000 tons of salable minerals would be recoverable from the proposed mining operation. [27] Mr. Hawley determined that with an initial $ 900,000 investment and $ 700,000 in annual operating expenses, the mining operation would turn a $ 650,000 profit (using a 10-percent per year adjustment figure) based upon expected costs of $ 46.60 per ton [28] and expected revenues of $ 75 per ton (using 1985 mineral prices). *419 2. The Sood Report
Petitioners also presented Dr. Mohan Sood as an expert witness. [29] Dr. Sood is a geologist who spent the summers of 1979 and 1981 studying the donated property's mineralization and reserves for Geneva Pacific. He wrote a report for Geneva Pacific in September 1980 (submitted as evidence at trial) detailing the mineralization of the property. The report stated that "the investigations of the structure, petrography and chemistry of rocks and minerals show close similarity to the deposits of Kennicott, Alaska, which are considered one of the world's largest deposits of this kind and produced huge quantities of copper metal until its closure in the 1930's." In his report, Dr. Sood made the following recommendations to Geneva Pacific: (1) Engage in systematic exploration and development; (2) map the anomalous areas in detail thereby facilitating the exact interpretation of the size of the deposit; (3) drill to confirm the extension of the ore deposits; and (4) conduct a geophysical survey in the drill holes to ascertain the extent of mineralization. *420 At trial, Dr. Sood concluded that there were sufficient mineral reserves on the donated property to support the Hawley Report's proposed mining operation. B. Valuations of Respondent's Experts
1. The Black-Smith Report
Respondent's first expert, Diane Black-Smith, is a real estate appraiser with Black-Smith & Richards, Inc. [30] Ms. Black-Smith has experience appraising properties in the Park. Ms. Black-Smith prepared an appraisal report, dated July 10, 1992, regarding the vacant 93 patented acres (excluding mineral rights). [31] Respondent did *421 not ask her to value the remaining 154 unpatented acres or the subsurface interests of the donated property. [32]
*422 MS. Black-Smith utilized the comparable sales approach to value the patented acres. She testified that this approach is the most credible and best approach to value vacant land. As a result of the general downturn of the Alaskan economy, property sales in the market area were limited in the mid-1980's. Thus, the comparables she selected were Park property sales occurring between 1975 and 1988, with sales prices ranging from $ 400 to $ 650 per acre. [33] *423 The comparable properties all have: (1) Size and access similar to the patented acres (i.e., access is only by air; none of these properties are on a road system); (2) superior topography; (3) superior development potential; and (4) location on the south slope of mountains (with plenty of sunlight). After making adjustments for various inequalities on an item-by-item basis [34] and taking the inferior characteristics of the patented acres into account, Ms. Black-Smith concluded that the fair market value of the Nelson Mine property was $ 300 per acre on the date of donation, for a total fair market value of $ 28,000. [35]
In Ms. Black-Smith's view, due to the existence of the surrounding Park and the remoteness of the area, the highest and best use of the patented acres is as a remote recreational cabin site or public park land, rather than as a developed recreational resort. She testified that three negative characteristics render the patented acres unsuitable for recreational development: (1) Its steep slope; (2) limited access; and (3) location on the north side of a mountain (receiving less sun and therefore less desirable). In her view, market demand for recreational subdivisions in the area was limited between 1983 and 1987. Ms. Black-Smith also testified that a commercial recreational development would not be feasible due to the availability of other, far superior vacant tracts in the area. 2. The *424 Reilly Report
Robert F. Reilly, [36] of Willamette Management Associates, recreated and critiqued the methodology that the Hawley Report used to value the patented acres. [37] The Reilly Report reached the following conclusions: (1) The Van Zelst Group property fee simple interest valuation, which measures the net present value of the net cash flow of a hypothetical recreational lodge * * * is based on an incorrect definition of value. [38] The correct definition of value for the subject appraisal is fair market value. *426 (2) The HRG [Hawley] valuation opinion report incorrectly concludes that the net present value of the net cash flow of a hypothetical recreational lodge is an indication of, in fact equal to, the "current value" of the land. The correct conclusion is that the net present value of the net cash flow of the hypothetical recreational lodge equals the expected value of the recreational lodge business entity. [39]
(3) The net present value of the hypothetical recreational development using the discounted net cash flow approach, as of July, 1985, is negative $ 312,000, after making adjustments for incorrect assumptions made by HRG are incorporated into their model. This *425 negative net present value means that no prudent or rational investor would make the economic decision to undertake the construction of such a project. [40]
(4) The most reasonable projected construction costs for the hypothetical recreational development are estimated at $ 2,371,000, as of July, 1985, rather than $ 1,800,00, as presented by HRG.
Finally, Mr. Reilly testified that the value of the hypothetical business venture would relate to the value of the land only if the land were so unique as to be the only possible location where the proposed business venture could be operated. He believed, however, that other tracts of vacant land existed in the area that could better accommodate such a resort. 3. The Clemmer Report
Luther S. Clemmer, [41] *428 a mining engineer, evaluated the Hawley Report's mining analysis and *427 determined the fair market value of the mineral interests in the donated property. [42] The Clemmer Report stated that although minerals may have been present on both the patented and unpatented acres, it was not economically feasible to mine the minerals on the donation date. [43] The Clemmer Report used the income approach to value, [44] and concluded that a mining venture on the donated property would have had a negative cash flow. The Clemmer Report used operating costs of $ 99 per ton, [45] along with a 25-percent discount rate (given the relatively high degree of risk associated with this type of mining venture). Because the gross value of the ore was determined to be $ 70 per ton, the Clemmer Report computed a $ 29 loss per ton of mined ore. Therefore, according to Mr. Clemmer, the highest and best use of the property was not mining. The Clemmer Report concluded that "the mineral estate had no value for mining on July 30, 1985, and its fair market value is appraised at ZERO." 4. The Paschall Report
Robert F. Paschall, [46] *430 a geologist, also prepared a report critiquing the assertions of the Hawley Report concerning mineral *429 deposits. Mr. Paschall concluded that the copper deposits on the donated property were in fact small and had no value on the date of donation because of: (1) The unpredictable geology of the mineral deposits; (2) the minuscule reserve of measured ore; (3) the poor financial condition of the copper industry; and (4) the high operating cost of extracting copper versus the low market price of copper. [47] With regard to the final factor, Mr. Paschall wrote: The entire copper industry was in severe financial straits at the June 1985 date of this appraisal, because the price of copper had declined from 97 cents [per] pound in 1980 to only 67 cents per pound. Operating costs had not similarly decreased, so copper mining was then uneconomic not only at Glacier Creek, but also at giant active copper mines in Utah, Arizona, and South America. It was thus not a time when even the most optimistic of miners would have invested in small deposits in a remote location that was subject to long and stormy winters.
In Mr. Paschall's opinion, the above factors rendered the deposit unprofitable to mine. As further support for his conclusion, Mr. Paschall noted that four major companies over a period of some 43 years deemed the deposit unprofitable to mine. II. Discussion
A. Income Stream Approach Vs. Comparative Sales Approach
As stated, the Hawley Report used the income stream or discounted cash-flow analysis to value the patented acres as a hypothetical recreational resort. In our opinion, such an approach is improper because the patented acres were unimproved and were not generating income. [48] We believe the comparable sales approach is the proper method to be used in valuing the patented acres. See, e.g., Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 19 (1979); Estate of Fawcett v. Commissioner, 64 T.C. 889, 899 (1975); *431 Kenroy, Inc. v. Commissioner, T.C. Memo. 1984-232; Estate of Stanton, T.C. Memo. 1989-341. The comparable sales approach involves gathering information on sales of property similar to the donated property, then making adjustments for various differences between the "comparables" and the property being appraised. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987). The "comparable sales" method is a commonly accepted method of appraising real estate. Expert opinions based on the comparable sales method have been found probative by this Court on numerous occasions. See, e.g., Estate of Stanton v. Commissioner, supra; Estate of Harms v. Commissioner, T.C. Memo. 1981-320. In our opinion, the hypothetical lodge analysis Mr. Shoemaker performed was in reality a feasibility *432 study, prepared to attract investors. Mr. Shoemaker estimated the value of a going-concern hotel business and simply assigned that value to the patented acres. We agree with Ms. Black-Smith and Mr. Reilly that such analysis is inappropriate to this case. Even assuming arguendo that this analysis was appropriate, Mr. Shoemaker's assumptions were for the most part unverifiable and refuted by respondent's experts. Further, Mr. Shoemaker failed to consider numerous attributes of the patented acres that are not conducive to building a recreational development. We agree with respondent's experts that due to the steep slope, lack of access, and remoteness, the patented acres are not physically suited for a resort. In essence, Mr. Shoemaker acted more as an advocate for petitioners' benefit than as an unbiased, independent expert. The valuation he determined for the patented acreage (exclusive of the mineral interests) was so egregiously exaggerated that in our opinion it surpassed the ludicrous. B. The Injunction
In valuing the donated property's mineral interests, the Hawley Report did not consider the July 22, 1985, injunction. [49] The injunction prohibited mining in the Park absent *433 a court order. Mr. Hawley admitted at trial that in order to properly take the injunction into account, the value he attributed to the minerals would need a substantial downward adjustment. He did not provide the Court with an adjusted figure. Petitioners contend that although any possible mining would have had to be delayed until 1990 when the injunction was ultimately lifted, it would not have been barred forever. We agree; however, on July 30, 1985, the date of donation, there was no indication whether the injunction would ever be lifted. Hindsight is always 20-20. We have held that the fair market value of property must be adjusted to take into account any legal restrictions with regard to the marketability of such property on the date of donation. See, e.g., Cooley v. Commissioner, 33 T.C. 223, 225 (1959), affd. 283 F.2d 945 (2d Cir. 1960); *434 Thornton v. Commissioner, T.C. Memo. 1988-479, affd. without published opinion 908 F.2d 977 (9th Cir. 1990). The Hawley Report failed to do so. We believe that the presence of the injunction decreased the value of the mineral interests considerably, as a prospective purchaser on the date of donation would not know whether mining would ever be possible. In addition, some inconsistencies and inaccuracies exist with regard to the Hawley Report's evaluation of the speculative mining venture. Mr. Hawley testified that such venture was not a "high risk operation" and consequently assigned a 10-percent discount rate to the project. However, the Hawley Report arrived at a different conclusion, stating that the "development of any mine has to be viewed as one of high risk." Mr. Hawley also testified that he mistakenly failed to make any assumptions for risk analysis with regard to the present net worth of the minerals. Further, we note that the Hawley Report failed to include exploration, transportation, smelting, marketing, and other costs necessary for this type of mining venture and failed to consider the added expenses of mining *435 in Alaska versus similar costs in the lower 48 States. C. The Mineral Interests
Messrs. Clemmer and Paschall determined that the mineral interests of the donated property had a zero value on the date of donation. They concluded that because of the combination of the high costs of extracting the copper and the low prices copper would command, it would not have been economically feasible to mine the property at the time of donation. We found Messrs. Clemmer and Paschall to be excellent witnesses and believe that their detailed analyses provide strong evidence for their conclusions. Nevertheless, Messrs. Clemmer and Paschall failed to consider the speculative value of the mining rights: copper prices could always increase and the injunction could be lifted. As a result, it could have become economically feasible to mine the property. Thus, a speculator would ascribe some value to the mineral interests based on the fact that conditions could change in the future. We believe that the mineral claims had some value for speculative purposes. D. Conclusion
We have closely considered the qualifications and experience of the parties' experts, their particular knowledge and *436 experience in valuing vacant land and mineral interests, as well as the substance and reasoning of their reports. We found respondent's expert witness reports and the testimony from such witnesses more useful and persuasive than those of petitioners' witnesses. We agree with Ms. Black-Smith that the comparable sales method was the more appropriate method to be used in this case, and that the patented acres were not suitable for recreational development. We also agree with Messrs. Clemmer and Paschall that it was not economical to mine the donated property on July 30, 1985. The Hawley Report's valuation of the donated property at $ 2,750,000 was based on two improbable and unrealistic assumptions: (1) A hypothetical use of the patented acres as a recreational resort (even though the property was vacant, remote, steep, and had limited access); and (2) the speculative mining project (even though it was illegal to mine the property without a court order and it was uneconomical to do so [50]). See Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). We have rejected expert testimony where the witness' opinion of value was so exaggerated that his testimony *437 was incredible. See Dean v. Commissioner, 83 T.C. 56, 75 (1984). Likewise, here, we reject the exaggerated conclusions pronounced by petitioners' experts. T.W. Van Zelst testified extensively at trial regarding the donated property. [51] We found his testimony to be self-serving and frequently contradictory. For example, in 1977, T.W. Van Zelst testified before the House Subcommittee on General Oversight and Alaska Land that the property was dangerous for tourists and inaccessible. But at the trial of this case, he testified to the exact opposite. Also, his statements and photographs regarding access and so-called "improvements" on the donated property were contradicted by Kit Mullen, *438 an unbiased National Park Service employee who worked on the property in 1985. In sum, we found T.W. Van Zelst not to be a credible witness. Based upon our consideration of all the valuation evidence introduced through testimony and documentation, we conclude that petitioners have not carried their burden to prove a $ 2,750,000 fair market value for the donated property on July 30, 1985. See, e.g., Anselmo v. Commissioner, 80 T.C. 872, 885-886 (1983), *439 affd. 757 F.2d 1208 (11th Cir. 1985). On the other hand, we believe that respondent has submitted highly probative evidence that the fair market value of the patented acres (exclusive of the subsurface interests) was $ 28,000 on July 30, 1985. However, in our judgment, $ 10,000 must be added to this figure for the possibility of future mineral extraction from both the patented and unpatented acres. The total $ 38,000 ($ 28,000 + $ 10,000) value is more than the price T.W. Van Zelst paid for the donated property in 1983, [52] *440 which in and of itself is probative evidence of the property's fair market value on the date of donation. [53] See, e.g., Chiu v. Commissioner, 84 T.C. 722, 734-736 (1985). We thus hold that the fair market value of the patented and unpatented acres on the date of donation was $ 38,000. [54]
We have considered petitioners' other arguments and find them to be without merit. Issue 2. 50-Percent Charitable Limitation
We need not address the issue of whether section 170(b)(1)(C)(iii) elections were properly made. This issue falls by the wayside in light of our holding that the fair market value of the donated property was $ 38,000 rather than $ 2,750,000. Issue 3. Negligence Additions to Tax
The third issue is whether petitioners are liable for additions to tax for negligence *441 or intentional disregard of rules or regulations pursuant to section 6653(a)(1) and (2) for 1985, and section 6653(a)(1)(A) and (B) for 1986 and 1987. Section 6653(a)(1), which was redesignated as 6653(a)(1)(A) for taxable periods for which a return is due after December 31, 1986, provides that if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a)(2), which was redesignated as 6653(a)(1)(B) for taxable periods for which a return is due after December 31, 1986, provides that if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination of negligence in the notices *442 of deficiency is presumed to be correct and petitioners have the burden of proving that it is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). Respondent has the burden of proving the increased negligence additions asserted in the amended answers. Mere reliance on an appraiser or expert in a matter does not automatically shield a taxpayer from the negligence addition; a taxpayer must affirmatively establish that his reliance was reasonable, prudent, and in good faith. Horn v. Commissioner, 90 T.C. 908, 942 (1988); Vesper v. Commissioner, T.C. Memo. 1989-358. Ralph Brown and T.W. Van Zelst were the only petitioners who testified in these cases. They stated that when they filed their Federal income tax returns for the years in issue, they relied on the Hawley Report and the advice of their accountant. We cannot agree that their reliance was reasonable, prudent, and in good faith. Both of these individuals are sophisticated investors. They should have known the Hawley Report grossly overstated the fair market value of the donated property. They should have been aware *443 that nothing had occurred to substantially increase the value of the property between the time T.W. Van Zelst purchased the property and the time it was donated. Indeed, with regard to the mineral interests, copper prices were declining. And, they should have realized that the hypothetical resort was unrealistic and that at the time of donation mining was illegal and not economically feasible. Common sense should have come into play. Indeed, common sense should have come into play for all petitioners. It was unreasonable for petitioners to expect that property purchased for $ 30,174 would increase to a value of $ 2,750,000 just 2 years later, generating such enormous charitable contribution deductions. See, e.g., LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); Pasqualini v. Commissioner, T.C. Memo. 1994-323 and 103 T.C. 1 (1994); Weitz v. Commissioner, T.C. Memo. 1989-99. Thus, based upon all of the evidence before us, we hold that petitioners are liable for the negligence *444 additions to tax for the years in issue. [55]
Issue 4. Valuation Overstatements Additions to Tax
The fourth issue is whether petitioners are liable for section 6659 additions to tax for valuation overstatements. [56] Pursuant to section 6659(c), a valuation overstatement exists if the value of any property claimed on a return is 150 percent or more of the amount determined to be the correct valuation of such property. For this addition to tax to apply, the underpayment for the taxable year attributable to the valuation overstatement must be at least $ 1,000. Sec. 6659(d). Further, with respect to charitable deduction property, the amount of the addition to tax is equal to 30 percent of the underpayment. Sec. 6659(f)(1). *445 The Secretary may waive this addition if the taxpayers are able to demonstrate that there was a reasonable basis for the valuation claimed and the claim was made in good faith. Sec. 6659. We believe that here the Secretary correctly did not waive the addition. We have recently held that it was not an abuse of the Secretary's discretion to refuse to waive the section 6659 addition where the values for deduction purposes were 63 times the amount originally invested. See Pasqualini v. Commissioner, T.C. Memo. 1994-323. Here, petitioners attempted to claim a charitable contribution deduction for approximately 91 times the amount T.W. Van Zelst paid for the property 2 years prior to donation. They grossly overstated the value of the donated property. Petitioners argue that the Secretary's refusal to waive the valuation overstatement additions was an abuse of discretion. They contend that there was a reasonable basis for the valuation claimed, and that the claim was made in good faith. We disagree. Respondent properly determined the section 6659 additions and the Secretary properly did not waive such additions. Issue 5. Additional Interest
The final *446 issue for decision is whether petitioners are liable for additional interest pursuant to section 6621(c) (formerly section 6621(d)) for the years in issue. Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) if there is a "substantial underpayment" (an underpayment in excess of $ 1,000) in a taxable year "attributable to 1 or more tax-motivated transactions". Tax-motivated transactions include valuation overstatements. Sec. 6621(c)(3). Petitioners made "blatant misuse of the charitable donation provisions" and "participated in a scheme to generate egregious charitable contribution deductions through the gross overvaluation of the items donated." See Johnson v. Commissioner, 85 T.C. 469, 483-484 (1985). In this case, the underpayment of taxes exceeds $ 1,000 for each year. Because any valuation overstatement is a tax-motivated transaction, the increased rate of interest set forth in section 6621(c) is applicable to each of the petitioners. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The following cases are consolidated herewith: Jean Van Zelst, docket No. 22031-90; Ralph E. and Suzanne Brown, docket No. 22032-90; Bradley and Anne L. Orvieto, docket No. 22033-90; and Theodore D. Van Zelst, docket No. 22034-90.↩
1. The additions to tax for negligence or intentional disregard of rules or regulations are codified under sec. 6653(a)(1)(A) and (B) for 1986 and 1987.↩
2. 50 percent of the interest due on the deficiency.↩
3. 120 percent of the interest due on the entire deficiency. Pursuant to the Tax Reform Act of 1986, sec. 1151(c)(1), Pub. L. 99-514, 100 Stat. 2744, former sec. 6621(d) was redesignated as sec. 6621(c).↩
1. The additions to tax for negligence or intentional disregard of rules or regulations are codified under sec. 6653(a)(1)(A) and (B) for 1986 and 1987.↩
2. 50 percent of the interest due on the deficiency.↩
3. 120 percent of the interest due on the entire deficiency. Pursuant to the Tax Reform Act of 1986, sec. 1151(c)(1), Pub. L. 99-514, 100 Stat. 2744, former sec. 6621(d) was redesignated as sec. 6621(c).↩
2. The notices of deficiency were based on a property appraisal prepared for respondent. While respondent did not repudiate this original appraisal, the amended answers are based on new appraisals prepared by different experts (discussed hereinafter).↩
1. The additions to tax for negligence or intentional disregard of rules or regulations are codified under sec. 6653(a)(1)(A) and (B) for 1986 and 1987.↩
2. 50 percent of the interest due on the deficiency.↩
3. 120 percent of the interest due on the entire deficiency. Pursuant to the Tax Reform Act of 1986, sec. 1151(c)(1), Pub. L. 99-514, 100 Stat. 2744, former sec. 6621(d) was redesignated as sec. 6621(c).↩
3. Our findings with regard to the donated property consider the property's status as of July 30, 1985, the date of donation.↩
4. A 1986 National Park Service Official Map and Guide of the Wrangell-St. Elias National Park and Preserve describes the Park, in part, as follows: This is a park for wilderness-oriented activities. Travel services and facilities are limited. Visitors are mostly on their own here and thus must be highly self-motivated and self-sufficient. * * * * There are few trails, so most hiking is across what appears to be previously untraversed terrain. * * * * Assistance may be days or miles away, so be extraordinarily careful in this vast region. You must possess proper survival gear and skills to handle mountainous terrain. * * * * Hikers must be familiar with safe techniques for crossing rivers and streams. Many are impassable, even for experts. Others can change from trickling creeks to raging torrents quickly, so be especially cautious.
On May 7, 1977, T.W. Van Zelst testified before the House Subcommittee on General Oversight and Alaska Lands and described the area as dangerous and inaccessible.↩
5. Generally, a patent on property grants its owner a fee simple interest in the property, allowing for actual surface ownership of land.↩
6. Unpatented acres provide only subsurface or mineral rights.↩
7. The Nelson Mine property is known as Spruce Claim Numbers 1 through 6, designated as Survey No. 1588, located in the McCarthy Mining District in the State of Alaska, and contains approximately 93.059 acres. The Peavine property involves the following lode mining claims (consisting of approximately 123.6 acres): Peavine Numbers 2 and 5; Triassic Numbers 70 and 71 (Binocular); and Boots-Agusta (Greenstone Mine). The unpatented acres also involve 6 unpatented mill site claims (consisting of approximately 30 acres) at the Peavine Mill sites.↩
8. The National Park Service owns the land upon which this airstrip is located.↩
9. No trams or bridges cross Glacier Creek near the airstrip or the patented acres, and the patented acres are not directly accessible by continuous roads or bridges.↩
10. From 1969 through 1979, T.W. Van Zelst was president of Geneva Pacific Corp. (Geneva Pacific). From May 1, 1980 through Apr. 30, 1983, he was its general manager.↩
11. Cenco, Inc. (Cenco) based in Chicago, Illinois, was a manufacturer and distributor of science and educational equipment. T.W. Van Zelst was an officer and director of Cenco in the late 1970's.↩
12. Cooper Industries (Cooper), located in Houston, Texas, manufactured energy tools and electrical devices.↩
13. While the record is unclear, it appears that the unpatented acres were part of 10,000 acres of unpatented Alaskan mining claims that Cenco had originally acquired by purchase and staking. In the 1970's, Cenco transferred its interest in the 10,000 acres to Geneva Pacific.↩
14. Cooper intended to donate its 10,000 Alaskan acres to the National Park Service, but T.W. Van Zelst made Cooper an offer on the donated property. This was the only offer Cooper received for any of the Alaskan land it possessed. After the sale to T.W. Van Zelst, on June 1, 1983, Cooper donated its remaining acres to the National Park Service.↩
15. The record does not contain any substantiated evidence regarding the dollar value for the royalty rights.↩
16. The Cenco option applied to all of Cooper's Alaskan real estate, including the donated property.↩
17. The price of copper substantially decreased between Apr. 1983 (77 cents per pound) and July 1985 (67 cents per pound). The copper industry did not begin to recover until 1988.↩
18. T.W. Van Zelst had discussions with the National Park Service regarding a possible donation of the subject property as early as Feb. 1983 (i.e., before he owned the property). He was well aware of the tax savings resulting from such a charitable donation.↩
19. We note that the injunction was dissolved on Dec. 28, 1990. However, as of the date of donation, there was no indication when or if the injunction would be lifted.↩
20. The "highest and best use" is defined as the most economic use which is reasonably probable. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 124 (3d ed. 1988).↩
21. The Hawley Resource Group, Inc., is engaged in consulting and contracting work. C.C. Hawley received a Ph.D. in geology from the University of Colorado. He has 33 years of experience in that field and is registered as a professional geologist in Alaska and Oregon. Toni K. Hinderman is an economic geologist with an M.S. from Stanford University. He has 18 years of experience in that field. William E. Shoemaker received a B.A. in business administration from the University of Notre Dame. He has 10 years of business experience in Alaska. He has owned and operated a lodge, and has real estate experience. We note that at the time of the appraisal Mr. Hawley was familiar with the donated property inasmuch as he did consulting work with respect to the potential for mineral development of the donated property as early as 1973.↩
22. In their respective petitions petitioners state that "the value for the Van Zelst Group Alaska Lands according to the Hawley Appraisal is conservative", and that "the Van Zelst Group Alaska Lands on July 30, 1985, were worth in excess of $ 4,600,000" to account for mining improvements, scenic beauty, and recreational value. It appears from the record that petitioners have abandoned this position.↩
23. Mr. Shoemaker did not visit the donated property.↩
24. Mr. Shoemaker wrote, "the land value would be based on the profit the owners would expect to make from the operation of a lodge or what profit opportunity is being forgone if the land is sold." The Hawley Report assumed that these values would be the same.↩
25. Mr. Shoemaker predicted that the project's construction costs would be $ 1,800,000. He also assumed a selling price of 2.5 times the gross revenues.↩
26. In valuing the donated property, the Report did not consider the July 22, 1985, injunction against mining in Alaskan National Parks without court approval.↩
27. However, Mr. Hawley testified that more than half of the 90,000 tons of reserves were either potential or inferred ore rather than proven reserves.↩
28. Mr. Hawley arrived at a $ 46.60 per ton cost by the following calculation: Cost Per Ton
Labor $ 26.40
Supplies
11.33
Freight
2.67
General & Admin.
6.20
46.60
At trial, Mr. Hawley adjusted the per ton cost from $ 46.60 to $ 52.60.↩
29. Dr. Sood received a Ph.D. in geology from the University of Western Ontario, in London, Canada. He is the Dean of the Graduate College of Northeastern Illinois University. Formerly, he was chairperson of the University's Department of Earth Sciences.↩
30. Ms. Black-Smith received a B.A. from the University of Washington. She has approximately 20 years of appraisal experience. She is a member of the American Appraisal Institute. In Dec. 1980, she established the firm of Black-Smith & Richards, Inc., an Anchorage real estate appraisal company. She is past president of Alaska Chapter No. 57 of Real Estate Appraisers, and was appointed as the Alaska State Coordinator for Legislation in the appraisal industry in 1988.↩
31. On July 9, 1992, Ms. Black-Smith visited the patented acres. She was unable to tour the property physically, but viewed it from the air. The helicopter in which she flew was unable to land on the property because of its steep slope. Ms. Black-Smith's helicopter was able to land across from the patented acres at the Glacier Creek airstrip, but the Glacier Creek's raging waters prevented her from crossing the creek to the patented acres. Ms. Black-Smith presented at trial a videotape of the property that she filmed from the helicopter, which was accepted into evidence. As background information, Ms. Black-Smith reviewed numerous on-site photographs of the patented acres taken in Aug. 1985 by Kit Mullen, resource specialist with the National Park Service. Mrs. Black-Smith also interviewed National Park Service personnel who completed a site survey of the Nelson Mine property.↩
32. We note that two experts, Messrs. Clemmer and Paschall, valued the mineral interests of both the patented and unpatented acres for respondent. See infra↩ pp. 25-28.
33. Petitioners argue that Ms. Black-Smith's report should have referred to another report she prepared regarding land in the Park similar to the donated property. The property addressed in Ms. Black-Smith's other report was located at May Creek. Ms. Black-Smith testified that she did not use the May Creek property as a comparable to the Nelson Mine property because it was a government acquisition and was thus not considered to be a market sale. In the May Creek Report, Ms. Black-Smith used the comparable sales approach to value the May Creek property at $ 1,100 per acre. This is substantially higher than the comparables used in her Nelson Mine Report. However, Ms. Black-Smith testified that the May Creek property was "far superior" to the patented acres at issue herein for several reasons: (1) It was the "gateway to the park" and was used as a staging area for hunters and other activities in the Park; (2) it had level topography; (3) it was located between two rivers in a valley and thus had a superior location; (4) it bordered a state-maintained airstrip and had easier access; and (5) it had on-site improvements that were in good condition. Thus, while we agree with petitioners that Ms. Black-Smith should have discussed the May Creek property in her Nelson Mine Report, we do not agree that the $ 1,100 per acre figure is relevant to the fair market value of the donated property.↩
34. Ms. Black-Smith used land characteristics such as location, size, time of sale, topography, and soil conditions to adjust the fair market value.↩
35. Ms. Black-Smith testified that she did not consider the amount T.W. Van Zelst paid for the donated property in reaching the $ 28,000 fair market value.↩
36. Mr. Reilly received a B.A. in economics and an M.B.A. in finance from Columbia University. He is a certified real estate appraiser, and a member of the National Association of Real Estate Appraisers. He is Willamette Management Associates' managing director for appraisal and valuation consulting services. Prior to his association with Willamette Management Associates, Mr. Reilly was both a partner and national director of the Deloitte and Touche Valuation Group.↩
37. Mr. Reilly's report did not discuss the donated property's mining potential.↩
38. The Reilly Report took issue with the Hawley Report's "use value" of the patented acres. The Hawley Report's use value analysis assumed that other assets, such as buildings and facilities, "are actually in an operating configuration and are generating a predictable, identifiable income stream". The Reilly Report asserted that, because the proposed recreational facility is a hypothetical and speculative project, reliance on the use definition for determining the property's fair market value is "inappropriate". The Reilly Report concluded that the values used in the Hawley Report are neither equal to fair market value nor consistent with generally accepted real estate appraisal methods regarding fair market value of land.↩
39. In essence, the Reilly Report states that the discounted net cash flow or income approach used in the Hawley Report is appropriate as an indication of fair market value only where the property is improved and generates a measurable, predictable income stream on the valuation date. In the instant case, the Nelson Mine property neither was improved nor generated an income stream. Therefore, the Reilly Report concluded that the income approach was inappropriate.↩
40. Mr. Reilly testified that the discount rate Mr. Shoemaker utilized was too low to attract venture capital "given the speculative nature of this venture".↩
41. Mr. Clemmer received a B.S. in mining engineering from the University of Minnesota, an LL.B. from LaSalle University, and has completed graduate courses in mineral economics at the Colorado School of Mines. He has over 40 years of experience with private mining companies, with the Federal government, and as a consulting mining engineer and appraiser.↩
42. Mr. Clemmer did not visit the donated property. He based his evaluation on documents provided by respondent. However, Mr. Clemmer has experience evaluating other nearby copper properties.↩
43. This conclusion is based on the assumption that the small ore reserve (only 90,000 tons) and short mine life (7 years) would make the property unattractive to mining companies and investors.↩
44. The Clemmer Report defined the income approach as determining anticipated income by "developing the annual income stream less the cost of operation to arrive at a net profit."↩
45. Mr. Clemmer arrived at the $ 99 per ton operating cost figure as follows: ↩
Cost Per Ton
Mining $ 40.00
Milling
5.00
Transportation
19.00
Marketing:
Refining   8.00
Smelting   8.00
General & Admin.
6.72
Legal/permitting
.55
Insurance/travel
2.17
Startup & exploration
3.89
Interest
1.11
Reclamation
.11
Camp
2.61
10% Contingency
1.72
Total
98.88
46. Mr. Paschall received a B.A. in geology from the University of California at Los Angeles (UCLA) and has done graduate work in the field at both UCLA and Oregon State University. He has taken appraisal courses at the Colorado School of Mines. He has 20 years of experience as a geologist in industry, followed by 16 years as senior mining appraisal engineer for the State of California, and 11 years as a private consultant. We note that Mr. Paschall did not visit the donated property. He did not believe that a visit was necessary because available reports on the geology and ore deposits (provided by respondent) were voluminous and could not be duplicated without several months of field work.↩
47. Mr. Paschall also testified that: (1) The donated property's topography would make it difficult to mine; (2) transporting the copper to a smelter would be both expensive and difficult; and (3) the short mining season would make mining unprofitable.↩
48. Mr. Reilly testified that using the income stream approach in this case "would be absolutely untraditional".↩
49. Mr. Hawley testified that he did not consider the injunction in his report because he wrote it before the injunction took effect.↩
50. Some of the corporate entities involved herein spent substantial funds in exploration costs but never commercially mined the property. In addition, the poor financial condition of the copper industry, along with the small amount of actual measured ore, would surely have discouraged potential investors.↩
51. T.W. Van Zelst produced at trial his own compilation report of comparable sales to supplement the Hawley Report's income stream approach. These comparables appear faulty for several reasons: (1) Some of the prices used in the report include asking or listing prices instead of actual purchase prices; (2) many of the comparables are located several hundred miles from the Nelson Mine property; and (3) many are small lots which cannot be compared to the market prices for larger tracts of land such as the Nelson Mine property. We therefore disregard his comparables.↩
52. While T.W. Van Zelst testified that he paid $ 40,000 for the donated property, the record reflects a price of $ 30,174. We assume that the $ 40,000 amount refers to the total he paid Cooper for the donated property, the International Harvester Scout II vehicle, and other personal property. However, $ 30,174 was paid for the donated property.↩
53. Both Ralph Cohen, former senior corporate counsel of Cooper and the secretary of Geneva Pacific, and Alan Riedel, who worked at Cooper at the time and was involved in the sale of the donated property to T.W. Van Zelst, testified that Cooper would not have sold the donated property for a minimal amount if it believed the property was worth millions of dollars.↩
54. Because petitioners failed to prove either the value of the royalty rights T.W. Van Zelst waived when he purchased the donated property, or the impact of the Cenco option on the donated property, we attribute no value to those factors.↩
55. The amount of the additions will be calculated in the Rule 155 computations, based on the figures stated in the amended answers and adjusted to reflect our opinion herein.↩
56. We note that here, too, respondent has the burden of proving the increased sec. 6659 additions to tax as asserted in the amended answers.↩