Theodore W. VAN ZELST, et al.,
Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.

No. 96–1833.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1996.

Decided Nov. 15, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied Jan. 15, 1997.

Jeffrey E. Schiller (argued), Schuyler, Roche & Zwirner, Chicago, IL, for Theodore W. Van Zelst, Louann H. Van Zelst, Jean Van Zelst–Bierner.

Ralph E. Brown, Schuyler, Roche & Zwirner, Chicago, IL, pro se.

Ralph E. Brown, Schuyler, Roche & Zwirner, Chicago, IL, for Suzanne Brown.

Richard Farber, Gary R. Allen, Robert W. Metzler (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, for Commissioner of Internal Revenue.

Robin L. Rivett, James S. Burling, Pacific Legal Foundation, Sacramento, CA, for Pacific Legal Foundation, Amicus Curiae.

Before CUMMINGS, BAUER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Canada's Mt. Logan, at 19,524 feet the second tallest peak in North America, and Alaska's Mt. St. Elias, at 18,008 the fourth, are the crowns of the world's greatest coastal range of mountains. Six other peaks (Bona, Blackburn, and Sanford in Alaska; Lucania, King, and Steele in the Yukon) top 16,000 feet. Mount Wrangell, at 14,163 feet roughly the size of Mt. Rainier and still growing, vents steam and ash at its summit. Air laden with moisture from the warm Japan Current flowing through the Gulf of Alaska is propelled 15,000 feet upward by this rocky front, losing 60° F in the process. Down comes the snow, and more snow, and more snow. Glaciers, one of them (the Malaspina) the size of Delaware, flow from the mountains to the sea; the Bagley Icefield is 4,000 feet thick and 90 miles long. Peaks still unnamed await their first ascent. In the upper elevations, Dall sheep and mountain goats are kings. Bears, moose, and wolves rule below. In 1980 the core of the Wrangell and St. Elias ranges in the United States, plus the eastern reach of the Chugach range, became the Wrangell—St. Elias National Park and Preserve, which contains 9 of the 16 highest peaks in the United States. The Park and Preserve, combined with the adjoining Kluane National Park in Canada, comprises 20 million acres of rugged and inaccessible terrain. Only two dirt roads enter the Park, and using them is an adventure in itself:

> The park is largely wilderness, with limited services available in the ghost towns of McCarthy and Kennicott. To get there, you will need a sturdy four-wheel-drive vehicle. Take the Richardson Highway to the Edgerton Cutoff. Drive 35 miles to the head of the McCarthy Road at the village of Chitina. The road is 58 miles of dirt, with one spectacularly terrifying crossing of a deep river gorge on an old railroad trestle. At the end of the road, you must park and cross the Kennicott River on two separate hand-pull trams. These trams are extremely dangerous; wear gloves and watch out for the pulley wheels, which have lacerated many fingers. Also, take care to avoid falling into the racing river below you.

*Fodor's Alaska* 228 (1994). If you get across safely, McCarthy is five miles to the east. On foot.

Today McCarthy and points beyond are destinations for mountain climbers, cross-country skiers, big-game hunters, and wilderness hikers. Years back, the dominant breed was prospectors. If "Kennicott" sounds familiar, it is because of the Kennecott Copper Company, which extracted 591,535 tons of copper and 9 million ounces of silver from a mine at the town of Kennecott, five miles north of McCarthy. Mine, town, and company were named after the nearby Kennicott Glacier, itself named after the explorer Robert Kennicott. (Prospectors weren't all that keen on spelling.) This single deposit was worth more than all the gold discovered in the Yukon Gold Rush. When the vein was exhausted in 1938, the works and milltown were abandoned. The railroad right-of-way became the dirt road that now (almost) connects Chitina and McCarthy. But the tectonic and volcanic processes that concentrated copper near the Kennicott Glacier were at work over a wider area, and prospectors fanned out. They staked hundreds of claims in the mountains. About 742,000 acres of land within the boundaries of the Park and Preserve are in private hands today. Yet all of the claims are inactive. Nary a producing mine exists in the area, not because the ore is poor but because the climate is harsh and transportation a daunting obstacle. Kennecott Copper Company built a railroad from its mine along the Chitina and Copper rivers to the port at Cordova, a feat that cannot be duplicated because the national government owns the land surrounding the claims and will not permit an extension of the railroad inside the Park. Materials would have to be hauled in, and minerals removed, by air or by giant all-terrain vehicles. Roaring glacier-fed braided rivers hamper overland movement during the warm season, and dependence on air transport would so increase costs that mines could not compete with rivals elsewhere in the world that operate year-round with cheap land or water access.

Ninety-three acres of land some 18 miles east of McCarthy, the "Nelson Mine," were patented to private owners in 1939. A "land patent" is equivalent to fee simple ownership. The Nelson Mine lies between 2,700 and 3,700 feet in elevation on the north side of a mountain above Glacier Creek, less than a mile upstream from its confluence with the Chitistone River. Across Glacier Creek from the Nelson Mine is a gravel airstrip owned by the National Park Service—but neither a bridge nor a tram spans this outwash, which drains Mt. Bona's Twaharpies Glacier (and several lesser glaciers) and cannot be forded during daytime in warm weather. The Park Service is not apt to allow a bridge to be built. The property has a steep gradient, making it hazardous for helicopters to land. Difficulties have not prevented exploration, however, and by 1979 more than $1.3 million had been spent on tests and improvements, such as cabins and mountaintop helipads. Viable operations proved elusive, and by 1979 Geneva–Pacific Corporation, the mine's owner, and Cenco Corporation, its parent, were out of money to continue. After a series of transactions, Cooper Industries came to own Geneva–Pacific and thus the Nelson Mine, which it put on the market in 1982—first for $500,000 and then for $250,000. No one made an offer.

T.W. Van Zelst was the principal manager of Geneva–Pacific from its founding in 1969 until Cooper acquired that corporation. By 1982 Cooper was anxious to get rid of unproductive mining properties. When he left Geneva–Pacific's employ in 1983, Van Zelst took with him the Nelson Mine plus 154 acres of nearby mineral interests including the Peavine, Radovan, Greenstone, and Binocular Prospect claims. The United States retains the surface interest in these unpatented lands, which we call the Peavine parcel for convenience. Both the Nelson Mine and the Peavine parcel are in the Preserve rather than the Park, and are outside the designated wilderness zone, so economic development is legally permissible. Van Zelst paid Cooper a total of $30,174 for the 247 acres in the Nelson and Peavine parcels. The sale was subject to an option that allowed Cenco to repurchase a partial interest if mining should commence by June 1, 1985. In 1983 Cenco was entitled to buy 30 percent of the land for roughly $500,000; it was offered the properties under this option but declined. Cooper retained another 10,000 or so acres of land in Alaska but could not figure out how to make a profit by exploiting them. It put the lot of them up for sale; no one offered to buy a single parcel for any price. Mining properties in Alaska faced not only the problems of extraction and the vicissitudes of the market but also the costs of environmental compliance; it was and remains possible for accumulated developmental efforts to give land a negative value. In June 1983 Cooper gave the whole 10,000 acres back to the United States.

Between 1983 and 1985 T.W. Van Zelst gave fractional interests to some of his friends and relatives; we call him and the recipients "Van Zelst" for convenience, because their behavior and legal interests are identical. On July 30, 1985, two months after Cenco's option expired, Van Zelst followed Cooper's example and donated the property to the United States. Secretary of the Interior Hodel issued a press release praising the donors' public spiritedness. Soon Van Zelst gave the United States cause to question that characterization. He deducted from his income, for tax purposes, the value of the Nelson and Peavine properties. According to Van Zelst, that value on July 30, 1985, was $2.75 million, so the tax benefits vastly exceeded the purchase price of $30,000, the present value of the revenue flow (zero), and the competing offers Cenco had received for the parcels (none).

Eventually the Commissioner of Internal Revenue disallowed the deductions, and the Tax Court held a trial to fix the fair market value of the property on the date of donation. See *McMurray v. CIR*, 985 F.2d 36, 40 (1st Cir.1993); 26 U.S.C. § 170(a)(1); 26 C.F.R. § 1.170A–1(c)(1). Van Zelst's position was based on an appraisal from the Hawley Resource Group, Inc., which opined that the property could produce 100 tons of 5 percent copper ore per day five months of each year, with minerals hauled to Cordova, more than 100 miles away, by cat-trains each November after the rivers froze. (Fuel and materials would be carted in during April,

before the spring thaw.) The present value of this operation in 1985, the Hawley Group concluded, was $650,000. This was backed up by the opinion of geologist Mohan Sood, who testified that the mineral resources were adequate to support the proposed rate of extraction. The remainder of the value, according to the appraisal, was attributable to the potential for a resort lodge at the Nelson Mine.

Diane Black–Smith, a real estate appraiser with extensive experience in Alaska properties (including properties in the Wrangell—St. Elias National Park and Preserve) testified for the Commissioner that this valuation was fantasy. Actual sales fetched only $400 to $650 per acre between 1975 and 1988, she testified—and she believed that the Nelson Mine property was inferior to these parcels because of high slope, restricted access, and location on the north side of the mountain, where lack of direct sunlight in the summer (when at the Park's latitude the sun follows the southern horizon) would make it a poor resort. She gave the Nelson Mine a value of $300 per acre, for a total of $28,000. Robert Reilly, an economist, and Luther Clemmer, a mining engineer, critiqued the mineral aspects of the Hawley Group report. They concluded that any copper mine in the area would have a negative cash flow, spending $99 per ton to extract ore worth $70 per ton. Robert Paschall, a geologist, observed that four corporate owners had found the Nelson Mine unprofitable when the price of copper was as high as 97¢ per pound; on the date of donation, when copper fetched 67¢, the property was not a prospect for development. Paschall noted that in 1985 mining was uneconomic "at giant active copper mines in Utah, Arizona, and South America. It was thus not a time when even the most optimistic of miners would have invested in small deposits in a remote location that was subject to long and stormy winters."

Judge Jacobs concluded that the Hawley Group's appraisal was unrealistic and determined that the Nelson and Peavine parcels together were worth $38,000 in mid–1985. 70 T.C.M. 435, 1995 WL 486474 (1995). No resort along the lines of the Hawley Group's proposal exists in or near the Park and Pre-serve, and the judge thought the Nelson Mine an unlikely site for the first, given access, slope, and sunlight considerations. Developers would choose better properties from among the 700,000+ acres in private hands (plus additional land in Canada, and more in the U.S. outside the Park). Our review is deferential, *Orth v. CIR*, 813 F.2d 837, 842 (7th Cir.1987), and we cannot call this decision clearly erroneous. Evidence was presented on both sides; the trier of fact was entitled to choose. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Van Zelst contends that Black–Smith did not select the appropriate parcels to compare with the Nelson Mine, and that she never set foot on the property (her helicopter could not land safely), but the former is a question for the Tax Court to resolve and the latter is irrelevant. Our own view, to the extent it matters, is that the trial judge was on the mark. The absence of any similar resort in the area speaks far more loudly than a paper proposal. Developers can choose better properties if they decide that a mountain lodge would be profitable. Van Zelst argues that the Nelson Mine would have been uniquely attractive because the tourists could have visited a working mine; but these days the back-country devotees who make pilgrimages to Alaska are more likely to be repulsed by equipment gouging 100 tons of rock daily from the mountain than they are to be attracted by the smell of diesel exhaust and the thunder of explosions that blast the rocks loose and overwhelm the sounds of nature.

Indeed, the appraisal is nonsense on its own terms. It should not have required the award of the 1996 Nobel Prize in Economics to William Vickrey, a pioneer of auction theory, to remind people that the market price of an asset depends on the *second*-most-productive use to which it can be put. See R. Preston McAfee & John McMillan, *Auctions and Bidding*, 25 J. Econ. Lit. 699 (1987). Suppose three parcels of private land in the Park are equally suitable to be the site of a resort that will bring its developer $2 million after costs of construction and operation. How much will the developer pay for the land? That depends on what else the owners can do with their land, as the developer will

shop for the lowest price. Suppose Parcel $A$ has a vein of ore with a present value of $650,000, and Parcels $B$ and $C$, which lack minerals, are suitable only for subsistence hunting and fishing (value $10,000). The owner of Parcel $A$ will not sell for less than $650,000, but the owners of Parcels $B$ and $C$ will sell for anything over $10,000. The developer will not pay $650,000 to the owner of Parcel $A$, when he can get land for so much less elsewhere, so Parcel $A$ is worth only $650,000 as the value of its second-best-use, a mine. If there were no Parcel $C$, the developer and the owner of Parcel $B$ would reach a deal in the range between $10,000 and $650,000: the developer never pays more than $650,000 (for he can turn to Parcel $A$), and the owner never takes less than $10,000 (for he can keep the land in its current use). When there is a Parcel $C$, a threat to buy it instead of Parcel $B$ helps the developer chisel the price down, unless the owners collude. As the number of available sites rises, the possibility of collusion declines. When there are hundreds of potential sites (as there are in the Park and Preserve), the price the developer must pay falls to the competitive level. To put this otherwise, *land* is not a scarce resource in these mountains; financing and entrepreneurship are the scarce ingredients, so they will capture the economic return of resort development. Yet the Hawley Group's appraisal attributed to the Nelson Mine 100 percent of the (potential) economic profit of a resort development. It did not offer a rationale for that allocation. At oral argument Van Zelst's lawyer tried to supply one by saying that the number of potential resort-mine combinations in the vicinity is small, but for reasons we have already explained even a "small" number of rivals allows the developer to capture the returns—if there are any returns to the odd combination of luxury resort and rock crushing.

As for the Hawley Group's estimate that the properties were worth $650,000 in mining: the court found, with ample support in the record, that mining 18 miles east of McCarthy would have been unprofitable in 1985 and the foreseeable future. The land had some value as an option to open a mine if the price of copper should rise or the costs of extraction fall; that value, the court thought, was $10,000. Added to Black–Smith's estimate of $28,000, this produced a total value of $38,000. The conclusion is not clearly erroneous. Once again actions speak more loudly than appraisals. There was in 1985, and is today, *no* operating mine in the area, for precisely the reason the court gave: high costs of extraction.

In approving the Tax Court's conclusion, we do not place any weight on an injunction, entered six days before the donation, that forbade mineral development in the Park without prior judicial approval. *Northern Alaska Environmental Center v. Hodel,* No. J85–009 CIV, 1985 WL 19992 (D.Alaska July 24, 1985), affirmed, 803 F.2d 466 (9th Cir. 1986). The injunction was not lifted until January 2, 1991. Van Zelst and a supporting *amicus* brief argue, with considerable force, that this injunction—based as it was on failure of the federal government to discharge its responsibilities under the environmental laws—cannot be turned to the federal government's benefit by virtue of its adverse effect on the value of private holdings. Harm done by the government is a reason to compensate the private owners, see *Nollan v. California Coastal Commission,* 483 U.S. 825, 833–34 n. 2, 107 S.Ct. 3141, 3146–47 n. 2, 97 L.Ed.2d 677 (1987); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), not to capitalize the harm into a lower value of the land. *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 905 (Fed.Cir.1986). For current purposes, therefore, we endeavor to evaluate the land's worth with legally unlimited development potential. Still, the Tax Court held that this value was negative in 1985, given the combination of high extraction costs and the low market price of copper. That finding—based on economic as well as legal limits—is copiously supported.

Having held that the claimed deduction exceeded the land's market value by almost two orders of magnitude, the Tax Court sustained the Commissioner's decision to impose penalties under 26 U.S.C. §§ 6653(a) and 6659 for negligent disregard of the rules governing the calculation of tax and for substantial overvaluation. The sections establishing these penalties have been amended and consolidated for more recent

tax years; we refer to the versions in force at the time. Section 6653 provided that any underpayment attributable to negligence leads to an extra tax equal to 5 percent of the underpayment, plus an increase of 50 percent in the interest on the underpayment. The Commissioner has the burden of establishing the taxpayer's negligence, and the court held this burden satisfied because Van Zelst's use of the Hawley Group report was not

> reasonable, prudent, and in good faith. [Van Zelst is a] sophisticated investor[ ]. [He] should have known the Hawley Report grossly overstated the fair market value of the donated property. [He] should have been aware that nothing had occurred to substantially increase the value of the property between the time [he] purchased the property and the time it was donated. Indeed, with regard to the mineral interests, copper prices were declining. And, [he] should have realized that the hypothetical resort was unrealistic and that at the time of donation mining was … not economically feasible. Common sense should have come into play.

70 T.C.M. at 447. Section 6659(b) provided for a tax equal to 30 percent of the underpayment, when the deduction claimed exceeds 250 percent of the property's market value. The Tax Court found that Van Zelst's claim was 7237 percent of the donated property's worth, so this requirement was satisfied, and to spare. The chasm between true value and the amount claimed as a deduction showed that the Commissioner had not erred in declining to remit the penalty, the court held. 70 T.C.M. at 448.

Van Zelst believes that the Tax Court was unduly influenced by an inappropriate benchmark: the $30,000 he paid for the parcels. He contends, and the Commissioner agrees, that a bargain purchase does not diminish the market value of the property or cap the deduction. A donor to a charitable institution (including the government) may deduct more than his basis in the property, sometimes without recognizing gain on the difference. The $30,000 figure was misleading for three reasons, Van Zelst submits: first, in 1983 the land was encumbered by the Cenco repurchase option; second, Cooper received valuable consideration in addition to the cash price; third, Cooper just didn't know the value of the land and therefore did not obtain top dollar. The third of these may be true, but it is hardly an argument Van Zelst should want to advance. Geneva–Pacific owned the parcels, and Van Zelst, as the firm's principal manager, owed it a duty of loyalty—including a duty not to transact with the corporation for a price less than the market value of the properties, without full disclosure of the difference to the board (which represented the interests of Cooper, by then Geneva–Pacific's parent corporation). Van Zelst was an employee of Cooper too. He does not contend that he disclosed his current high estimate of the land's worth, and because Van Zelst presents himself as an honest entrepreneur we must assume that he paid the market price as of 1983. That price may have been depressed by the Cenco option, but the effect could not have been great, for the option expired in two years and the owner had only to wait it out before developing the land. (Even in 1983 Cenco's option covered only 30 percent of the interest and had a hefty strike price.) That leaves Van Zelst's argument that non-cash consideration boosted the effective price of the land. Unless the real price was $1.1 million or more, the claimed deduction still exceeded 1983 market value by 250 percent, and nothing in this record supports an inference that Van Zelst gave Cooper more than $1 million in non-cash consideration. Van Zelst tells us that in exchange for the land he gave up: rights to 5 percent of all profits from mineral operations in more than 15,000 acres of Alaska lands; employment as a senior executive of Cooper (and, with employment, participation in its stock option and pension plans, plus accrued leave); and any legal claims against Cooper, such as a claim for age discrimination. What's missing, as the Tax Court observed, is any effort to put a value on the rights surrendered. When Van Zelst closed the deal on the Nelson and Peavine parcels, Cooper was just about to give its mineral-bearing lands to the United States, and 5 percent of nothing is … worthless. What the other items may have been worth to Cooper was left to the trial court's imagination. Not good enough, the court thought, for a subject on which Van Zelst bore the burden of persuasion. Right it was.

There remains an argument that the Hawley Group's appraisal not only precludes the negligence enhancement but also compels the Commissioner to conclude that the taxpayer acted reasonably and in good faith (which would preclude the over-valuation enhancement). An appraisal may show that the taxpayer acted both prudently and reasonably, but it does not compel this inference. Under § 6659 it is not reliance on an estimate, but *reasonable* reliance that mitigates the penalty. Although negligence is an "ultimate issue," appellate review remains deferential. *Accardo v. CIR*, 942 F.2d 444, 452 (7th Cir.1991); *Forseth v. CIR*, 845 F.2d 746, 749 (7th Cir.1988). Cf. *Pullman–Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982). Taxpayers cannot reflexively blame their experts (or their attorneys) and avoid penalties when things go wrong. *United States v. Boyle*, 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). Van Zelst was not an armchair investor dependent on others for his knowledge of the land's value; he was himself an expert, who also knew the number of resorts in the area (zero), the price of copper (67¢ and falling), the number of corporations that had owned the Nelson Mine without figuring out how to make a profit (four), the number of years the claim had lain fallow since the patent issued (46), the number of producing copper mines near the Park (none), what the land sold for in 1983 ($30,000), the highest competing bid for the Nelson Mine (zero), and the highest bid Cooper had received for any of its other parcels (zero). He had to have known that the Hawley Group's estimate was hooey, the sort of number ginned up to put one over on the revenooers.

What galls Van Zelst is the idea that the Internal Revenue Service has penalized him for relying on the National Park Service's favorite expert. His brief tells us (underlining in original): "It was the government which recommended Hawley. The Alaska Regional Director of National Parks specifically stated [to Van Zelst] that: '[h]e is the best you can get. We highly recommend him!'" This is a tad misleading; before this conversation took place, Van Zelst already had decided to retain the Hawley Group. What the Regional Director defined as "the best" may not have been what the Commissioner or Congress had in mind. The Park Service wants to encourage donations, and sky-high appraisals do so. The Park Service cannot bind the Revenue Service either directly or indirectly; Van Zelst has acknowledged this. What is more, there is a difference between C.C. Hawley, the geologist who has served on several governmental advisory committees and whose name so excited the Regional Director, and the Hawley Resource Group, Inc., which Van Zelst engaged. C.C. Hawley's contribution was a mineralogical assessment, which as things turned out was subordinate to economic considerations. William E. Shoemaker was responsible for valuation of the resort prospect. It was the ludicrous attribution of $2.1 million to this unlikely turn of events that propelled the parcel's total valuation into the stratosphere. The Tax Court did not exceed the scope of the reasonable in its evaluation of these events.

AFFIRMED.