142 F.3d 440
 81 A.F.T.R.2d 98-1865, 98-1 USTC P 50,432
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
David E. PRICE and Mary R. Price, Petitioners Appellants,
v.
Commissioner of Internal Revenue, Respondent Appellee
 No. 97-2842.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 13, 1998.
Decided May 6, 1998.
 
 Appeal from the United States Tax Court. Maurice B. Foley, Judge.
 Before Hon. RICHARD A. POSNER, Hon. DANIEL A. MANION, Hon. ILANA DIAMOND ROVNER, Circuit Judges.
 
 ORDER
 
 1
 David Price, an attorney who once worked for the IRS, deducted over $86,000 in business-related bad debt over a three-year period, from 1990 to 1992. In February 1995, the IRS disallowed those deductions and notified Price that he owed over $30,000 in back taxes. The Service also added a 20% statutory penalty on the ground that Price had acted negligently in filing his returns. In May 1995, Price petitioned the United States Tax Court to reverse the IRS' assessment, but the Court affirmed the Service in all respects. Price now appeals from the Tax Court's decision. We affirm.
 
 I.
 
 2
 David Price has been an attorney since 1970, and his first job was with the IRS. He worked for the Service for seven years, and then opened a private law practice in Dale, Indiana. Presently he is a partner in his own firm specializing in corporate and estate planning matters. Price's biggest client over the years has been Walter Scott Taylor, Sr., and his children--a family owning Indiana coal mines. In the late 1970s, the Taylors diversified a bit by purchasing an interest in Speedmart, Inc., an Indiana corporation that operated convenience stores by the same name. The Taylors owned and operated a Speedmart in Cannelton, Indiana, but it lost money every year after it opened in 1979. Though there were no profits, Price accepted a 20% share in the store as compensation for legal services rendered to the Taylors.
 
 
 3
 In 1982, the Taylors moved to Alabama. At that time Price took over the day-to-day management of Speedmart, serving as its president and the manager of the Cannelton store. Speedmart was authorized to pay Price an annual salary of $18,000, but no salary was ever paid. By 1983, Price had expanded Speedmart's operations from one store to five. He installed gas pumps and food concessions at each location, opened the stores 24-hours a day, and hired a general manager. Nothing worked. In June 1985, Speedmart filed for protection from its creditors under Chapter 11 of the Bankruptcy Code. Price closed and sold four Speedmart stores and tried to make the remaining one profitable.
 
 
 4
 Price claims that he advanced funds to Speedmart in the early 1990's. But rather than carefully lending the corporation money and taking back properly drawn and executed promissory notes, he instead injected his own money into the company to pay incoming bills. Ultimately he wanted to deduct the payments as bad debt, his bankruptcy attorney told him in that case it would be necessary for the advances to be in the form of a loan. In December 1991, Price put together an umbrella note that encompassed all the amounts he previously had "loaned" the company. In the umbrella note, Speedmart promised to pay "All sums advanced in cash and inventory." The terms called for 8% interest and repayment of principal thirty days following demand. There is no evidence that Price ever demanded any payment from Speedmart.
 
 
 5
 Price's efforts to revive Speedmart failed, and in 1992 he sold the remaining store to a competitor. In 1990, 1991, and 1992, Price reported bad debt expenses of $24,000, $34,103 and $28,000 on his Schedules C. (the Service's form pertaining to profit or loss from a sole proprietorship). He also claimed over $2,000 in unreimbursed partnership expenses over that three-year period. By February 1995, the IRS had issued a notice of deficiency disallowing the claimed deductions. The Service later asserted a negligence penalty for each of the three years.
 
 II.
 
 6
 The primary issue before us is whether the Tax Court correctly determined that Price's advances to Speedmart were infusions of capital rather than loans, meaning Price could not deduct them as bad debt expenses under the Internal Revenue Code. See 26 U.S.C. § 166. Whether a transfer of funds constitutes a loan for tax purposes "has been variously described as one of fact or one of law ." Matter of Larson, 862 F.2d 112, 116 (7th Cir.1988). We need not struggle over the proper standard of review in this case (in particular, whether to review de novo or for clear error) because, even without extending any deference to the Tax Court's conclusion, Price's advances had most of the markings of capital infusions rather than loans.
 
 
 7
 To determine whether a transfer of funds to a corporation constitutes a liability or a capital infusion, courts have looked at several factors: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date, a schedule of payments, a fixed rate of interest, and whether repayments of any kind ever were made; (3) the source of repayments; (4) the adequacy or inadequacy of capitalization; (5) the identity of interest between the creditor and the stockholder; (6) the security, if any, for the advances; (7) the corporation's ability to obtain financing from outside lending institutions; (8) the extent to which the advances were subordinated to the claims of outside creditors; (9) the extent to which the advances were used to acquire capital assets; (10) the presence or absence of a sinking fund to provide repayments. See, e.g., Roth Steel Tube Co. v. CIR, 800 F.2d 625, 630 (6th Cir.1986); Bauer v. CIR, 748 F.2d 1365, 1368 (9th Cir.1984). No one factor is controlling, Bauer, id.; rather, a court must "look to the circumstances of each case ." Id.
 
 
 8
 In this case, we need not labor long over the factors because for the most part they point one way. Many circumstances persuade, but chief among these is the complete absence of any note or other instrument of indebtedness offered by Price at the hearing before the Tax Court judge. All Price could do in support of his claim that the advances were loans was to point to his 1991 umbrella note, which references previous "sums advanced." But he produced no instruments that a creditor typically would keep when making a loan, and the absence of any documentation "is a strong indication that the advances were capital contributions and not loans." Roth Steel Tube Co., 800 F.2d at 631 (6th Cir.1986).
 
 
 9
 Other factors are also convincing. For example, the 1991 promissory note had no fixed maturity date. Rather, payment was on demand with thirty days notice. This suggests that Price's advances were tied to the fortunes of the business, which is more typical of an equity advance. The debtor would pay when and if it had the money. See, e.g., In Re Lane, 742 F.2d 1311, 1316 (11th Cir.1984). In addition, there is no evidence that Price ever demanded repayment on the note, and in any event no payments of principal ever were made. While the note was interest-bearing, no interest was paid. The advances themselves were unsecured. While Price guaranteed Speedmart's notes to other creditors, he demanded no guarantees from other shareholders of his own contributions to Speedmart. His advances clearly were subordinated to the claims of other creditors. Finally, there is no evidence that the contributions were used to acquire capital assets (as opposed to keeping Speedmart afloat), nor any evidence that Speedmart had a sinking fund where certain assets and their earnings were set aside for the repayment of the advances.
 
 
 10
 The difference between a "capital investor and a creditor ... is that the creditor expects repayment regardless of the debtor corporation's success or failure, while the investor expects to make a profit." Matter of Larson, 862 F.2d at 117. While Price apparently did not demand additional equity in Speedmart in exchange for his contributions (a fact which under other circumstances might suggest he was a creditor rather than an investor), each of the other factors convinces us--as they did the Tax Court--that he expected repayment from Speedmart only if the infusions managed to turn the business around, which, of course, they did not.
 
 
 11
 For his part, Price argues that he intended the advances to be equitable contributions--not loans--which is why he sought the assistance of an accountant and bankruptcy lawyer in executing his 1991 promissory note. What Price really is saying is that he wanted the 1991 promissory note to make his earlier advances look like loans, even though every other circumstance revealed them to be capital infusions when he made them. We will not dispute that at some point Price realized the tax implications of his advances (and wanted to avoid them). Nor do we dispute that he wanted very much to deduct those advances from his tax returns. But we cannot elevate his subjective intent over the objective factors outlined above. See In Re Lane, 742 F.2d at 1316 ("A court must look not simply at self-serving declarations of the parties, but instead must examine those circumstances surrounding the transaction."). Those factors convince us that Price was acting as an investor, not a creditor, making his capital contributions to Speedmart's short-term survival necessary but unfortunately not deductible.
 
 
 12
 Price also contests the IRS's assessment of a negligence penalty on top of his assessment liabilities. See 26 U.S.C. § 6662(a). The Tax Court determined that Price's experience as a tax lawyer with the IRS meant he should have known better than to deduct his contributions as bad debt. "Although negligence is an 'ultimate issue,' appellate review remains deferential." Van Zelst v. CIR, 100 F.3d 1259, 1265 (7th Cir.1996). Price's main line of defense is that he relied on an accountant and a bankruptcy lawyer, both of whom purportedly told him he could claim the advances as bad debt if he structured them in the form of loans. At most, this means he was concerned enough about the deductibility issue to seek the advice of others. Perhaps he should have obtained advice much sooner or at least more thorough advice--advice apprising him of the chances the IRS might instead treat the advances as capital infusions. But as a practitioner in corporate law and estate planning as well as a former tax lawyer with the IRS, Price himself should have known of the risk. "Taxpayers cannot reflexively blame their experts (or their attorneys) and avoid penalties when things go wrong." Id. Price cannot blame others for his error. His belated realization that his payments on behalf of the corporation instead should have been bona fide loans was just that--belated; it could not rescue his hoped-for tax deductions when the business failed.
 
 
 13
 AFFIRMED.